NO. 07-07-0401-CR

 

IN THE COURT OF
APPEALS

 

FOR THE SEVENTH
DISTRICT OF TEXAS

 

AT AMARILLO

 

PANEL B

 

FEBRUARY 18, 2010

_____________________________

 

RICKY MORRISON,
APPELLANT

 

V. 

 

THE STATE OF TEXAS,
APPELLEE

_____________________________

 

FROM THE 137TH
DISTRICT COURT OF LUBBOCK COUNTY;

 

NO. 2007-417,356;
HONORABLE CECIL G. PURYEAR, JUDGE

_____________________________

 

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 

 

MEMORANDUM OPINION

 

 

Appellant Ricky Morrison appeals his
conviction of the offense of aggravated sexual assault and the resulting
sentence of fifty years confinement in the Institutional Division of the Texas
Department of Criminal Justice.  By two
points of error, appellant contends the evidence presented was factually
insufficient to support his conviction and the trial court erred by admitting
his recorded statement to police into evidence. 
We affirm.

 

 

Background

            Via
an August 2007 indictment, appellant was charged with three counts of
aggravated assault, including one count of aggravated sexual assault.[1]
The State proceeded to trial on this count alone.  The indictment also included an enhancement
paragraph setting forth appellant’s prior felony conviction for aggravated
kidnapping.[2]  Following appellant’s plea of not guilty, the
case was tried to a jury.

            At
trial, the State presented evidence to show that on March 29, 2007, Theresa Freda
was violently and sexually assaulted by appellant after he offered her a ride
home from a party.  At the close of the
evidence, the jury found appellant guilty of aggravated sexual assault as
charged in the indictment and assessed punishment as noted.  Appellant timely appealed his conviction and
sentence.

Analysis

Factual Sufficiency

            A
factual sufficiency review of the evidence is “barely distinguishable” from the
legal sufficiency review under Jackson v. Virginia.[3]  Marshall v. State,
210 S.W.3d 618, 625 (Tex.Crim.App. 2006).  On direct appeal a court must begin
its factual sufficiency review with the assumption
that the evidence is legally sufficient.  Watson v. State, 204 S.W.3d 404, 406 (Tex.Crim.App.
2006). A factual sufficiency review considers
whether the evidence supporting guilt, though legally sufficient, is so weak
that the jury’s verdict seems clearly wrong and manifestly unjust, or evidence
contrary to the verdict is such that the jury’s verdict is against the great
weight and preponderance of the evidence. 
Watson, 204 S.W.3d at 414-15; Johnson v.
State, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000).  Performing such a review, we consider all the
evidence, in a neutral light.  Marshall,
210 S.W.3d at 625; Watson, 204 S.W.3d at
414.   

            As pertinent here, to secure a conviction for aggravated sexual assault, the State must  prove beyond a
reasonable doubt the defendant intentionally or knowingly caused penetration of
the sexual organ of another by any means, without that person’s consent; and by
acts or words occurring in the presence of the victim threatened to cause or
placed the victim in fear of death, serious bodily injury, or kidnapping.  Tex. Penal Code Ann. § 22.021(a)(1)(A)(i), (a)(2)(A)(iii) (Vernon
2007). 

            The
events leading to appellant’s prosecution occurred in the early morning
hours.  Freda, a 40-year-old, testified
she left a party where she had taken drugs and drunk
beer.  When she was unable to contact her
husband, she decided to walk home. Appellant, whom she knew from “smoking
crack,” drove past in his white pickup. 
He offered Freda a ride home and she accepted.

            Freda
testified that on the way, appellant told her he needed to stop at his
house.  Freda went into appellant’s house
for a drink of water.  While there,
appellant pulled Freda into a “vice grip” and Freda told him to “quit it.”  When appellant disregarded her request that
he release her and instead pulled her closer, Freda became scared and began
struggling.  As appellant attempted to
drag Freda into the bedroom, she latched onto the door frame but appellant
managed to pull her into the bedroom and shut the door. He grabbed a knife and
shoved it into the doorjamb.  Appellant
ordered Freda to take her clothes off and she complied because she was scared, in
part because of appellant’s access to the knife.  Appellant started to take his own clothes off
and ordered Freda onto the bed.  

Appellant got
on top of Freda, but she fought “vehemently” to keep him from raping her.  She said that during their struggle appellant
inserted his finger into her vagina.  On
re-direct, Freda testified that she told hospital personnel that appellant “shoved
his finger inside of me.”  Freda
testified that she “snapped” when this happened and became “like a wild
animal,” trying to get out of there and “grabbing wherever [she] could.”  Appellant finally stopped and told Freda to
get dressed.  While she was dressing, she
heard appellant mumbling about not going back to prison and saying that he
would “kill [Freda] first”.  Freda was
terrified she would not survive the situation.

            Despite
appellant’s warning not to run as they left the house, Freda took the
opportunity to attempt escape as appellant got into his truck. She said she
reached a neighbor’s house but was able to knock only once on the door before
appellant grabbed her wrist.  Appellant
told her she was going to die and he “was going to die right along with [her].”  Freda ran to a car parked in front of the
neighbor’s house and held on while appellant continued to try to grab her and
move her.  Appellant pulled at her shirt,
eventually pulling her shirt and bra off. 
When appellant hit Freda, causing bleeding, she screamed.  Freda then heard appellant’s knife “click” and
she screamed three more times.  She
assumed a fetal position while appellant cut the left side of her face and
eye.  Two neighbors heard and saw the
commotion and called police.  

            Officer
Eric Sturgeon testified he answered the domestic disturbance call.  When he arrived, he spoke with Pauline
Escamilla, a neighbor of appellant. 
Sturgeon testified that Escamilla was upset and told him she woke up
when she heard a scream.  She went
outside and down the street and saw a male kicking and hitting a female lying
on the ground.  Escamilla yelled at the
male and he ran off.  Freda told
Escamilla that the person kicking and hitting her was appellant.  Escamilla took Freda into her house, where
Sturgeon saw Freda lying on the kitchen floor. 
She did not appear to have a shirt on, but was covered with a blanket on
top and was wearing jeans.  Freda had
blood covering her face and hair and there was blood around her head and on the
kitchen floor.  Freda was crying and told
the officer that appellant had attempted to sexually assault her but she fought
him off.  

            As
Sturgeon walked toward appellant’s house, he saw pools of blood on the
street.  A second officer, Rosa Cox,
testified to the pools of blood and opined that it appeared someone had been
dragged. She noted blood in the mud as well. 
Photographs in evidence depict Officer Cox’s descriptions and
observations.  She testified she did not
find any clothing on the street.  

            Officer
Matthew Martinez testified he spoke with Freda at the hospital.  Her statement to the officer was generally
consistent with her testimony at trial. Officer Martinez observed that Freda
appeared to have been involved in a struggle and agreed that her statement was
consistent with the injuries he observed. The jury saw photographs also depicting
Martinez’s descriptions and observations. 


            Appellant’s
two neighbors also testified to observations generally consistent with Freda’s
version of the events outside appellant’s house.  Joe Gutierrez testified he had known
appellant for over twenty years.  He
further testified his mother-in-law woke him up at about 2:30 on that morning
because she heard a woman screaming in the street.  Gutierrez also heard a scream and stated it
“just scared the hell out of [him].”  He
called 911, telling the operator there was a woman outside, screaming, and that
he thought someone was getting hurt.[4]  After he made his 911 call, Gutierrez went
outside and saw two shadows in the street. 
He said he saw a female on the ground and a male figure standing over
her, straddling her.  Gutierrez shortly heard
Pauline Escamilla call out to the people in the street.  The male figure stood up and Gutierrez
recognized him as appellant.  A minute
later, Gutierrez saw appellant’s truck drive away.  He was not sure if appellant was driving
it.   

            Pauline
Escamilla testified she and appellant had been neighbors since 1993.  She said that at about 2:30 a.m., she heard “a horrible pain scream” coming from a woman.  She heard voices and recognized appellant’s
voice.  Escamilla saw a man she
immediately recognized as appellant, hitting a woman.[5]  She screamed at appellant, calling him a name
and telling him to “leave that girl alone.” 
Escamilla testified that appellant immediately took off and got in his
truck.  She then clarified that she did
not see appellant get in the truck but saw his truck driving away.[6]  

            Escamilla
testified she took Freda into her house. 
She said Freda “was
totally bleeding from the top of her head to her waist” and she was naked from
the waist up.  She said Freda was
hysterical and appeared to be in a lot of pain. 
Escamilla also called 911.  She
testified that Freda told her that appellant was beating her up.  

            Detective
Tracy Taylor testified he took Freda’s written statement when she came to the
police department the next day.  The
statement was largely consistent with the injuries the detective observed on
Freda.  Freda clearly identified
appellant as her attacker.  

            Terry
Curtis, a friend of appellant’s, testified for appellant.  He said he was at appellant’s house with
appellant and Freda.  He testified that
Freda was mad at appellant because he refused to take her where she wanted to
go so she left the house with two men. 
Curtis testified that he was at appellant’s house until 1:00 that
morning and did not see appellant hit Freda. 


Appellant gave
police a recorded oral statement, which was played at trial over his
objection.  In the statement, appellant
maintained that he did not assault Freda in any way.  He said she left his home and just walked
away.  He did not see her again that
night.  If neighbors identified him as
Freda’s attacker, they were “lying.”

            In
his argument on appeal, appellant acknowledges the probative value of the
testimony of his neighbors who identified him as the person they saw assaulting
Freda. Appellant further acknowledges a conviction for sexual assault may be
affirmed solely on the testimony of the victim, despite the absence of any
medical evidence. Appellant nonetheless argues the evidence that he penetrated
Freda as the indictment alleged is so weak as to be factually
insufficient.  In support of his
argument, appellant points to a complete absence of medical evidence of
penetration, together with evidence Freda failed to make her outcry at the
earliest opportunity, told officers and hospital personnel nothing about the digital
penetration, and turned down a sexual assault exam.[7]

Although the
officer’s reports state Freda complained of an attempted sexual assault, the
reports do not mention the digital penetration. 
In fact, Martinez testified Freda told him no penetration was made.[8]  His report stated “No penetration occurred whatsoever.” 

            As
noted, a conviction for indecency or sexual assault may be affirmed absent any
medical evidence and solely on the testimony of the victim.  Rodriguez v. State, 819 S.W.2d 871,
873-74 (Tex.Crim.App. 1991); Tinker v. State,
148 S.W.3d 666, 669-70 (Tex.App.–Houston [14th
Dist.] 2004, no pet.), citing Garcia v. State, 563 S.W.2d 925, 928 (Tex.Crim.App. 1978); Bottenfield
v. State, 77 S.W.3d 349, 356 (Tex.App.–Fort Worth
2002, pet. ref’d). 
The jury had an ample opportunity to evaluate Freda’s credibility.  Although our authority to review the factual
sufficiency of the evidence permits us to disagree with the jury’s
determinations, even to a limited degree those concerning the weight and
credibility of the evidence, we must accord them due deference.  Marshall,
210 S.W.3d at 625; Johnson,
23 S.W.3d at 9.  Despite Freda’s somewhat
inconsistent prior statements and her admittedly impeachable background, the
jury did not act in an irrational manner by choosing to accept her testimony
she was digitally penetrated.  See Grotti v. State, 273 S.W.3d 273, 283 (Tex.Crim.App.
2008) (ultimate question in factual sufficiency review is whether jury was
rationally justified in finding guilt beyond reasonable doubt); Marc v.
State, 166 S.W.3d 767, 772 (Tex.App.–Fort Worth
2005, pet. ref’d) (finding jury could have chosen to
believe victim despite her history as drug user, prostitute and felon).  See
also Goodman v. State, 66 S.W.3d 283, 286 (Tex.Crim.App.
2001) (explaining jury’s entitlement to believe Cretan Liar with five prior
perjury convictions).  

            Further,
we note that the State presented a convincing case appellant was the man who
assaulted Freda in the street outside his home. 
The jury heard no evidence from which it could discern a motive or
reason for such an attack other than that presented by Freda’s testimony. We do
not see an objective basis on which to find that the great weight and
preponderance of all the evidence contradicts the jury’s verdict. We find the evidence factually
sufficient to support appellant’s conviction and overrule his first point of
error.

Appellant’s Statement

            In
appellant’s second point of error, he argues the trial court erred under
article 38.22, § 3(a)(5) of the Code of Criminal
Procedure in overruling his objection to the introduction of his recorded statement
into evidence, thus affecting his substantial rights. Article 38.22 of the Code
of Criminal Procedure governs the admissibility of statements of an accused
made as a result of custodial interrogation. 
See Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2001).  Section 3(a) provides, in relevant part, “No
oral or sign language statement of an accused made as a result of a custodial
interrogation shall be admissible against the accused in a criminal proceeding
unless: (1) an electronic recording, which may include motion picture, video
tape, or other visual recording, is made of the statement; . . . and (5) not
later than the 20th day before the date of the proceeding, the
attorney representing the defendant is provided with a true, complete, and
accurate copy of all recordings of the defendant made under this article.”
Article 38.22, section 3(a) is to be strictly construed and courts may not
interpret it as making a statement admissible unless all requirements have been
satisfied by the State.  See Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2001). 
Nonetheless, an error of admission of a statement in violation of § 3(a)(5) is subject to a harm analysis.  See Sells v. State, 121 S.W.3d 748, 765 (Tex.Crim.App.
2003) (finding error harmless).

            During
trial, when the State offered appellant’s recorded statement, appellant’s
counsel objected, informing the court he had not received the recording in the
time period provided in § (3)(a)(5).  He
said the State did not turn over the recording until less than two weeks before
trial.  Without hearing a response from
the State or further comment, the trial court overruled the objection.  The State appears to concede on appeal that
it failed to comply with § (3)(a)(5).  On this state of the record, we will assume
the trial court erred by admitting the recorded statement, and proceed to
evaluate the harmfulness of the error.  The
focus of our harm analysis will be on the harm flowing from the erroneous admission of appellant’s
statement.  Sells, 121 S.W.3d at 765; Tigner v. State, 928 S.W.2d 540, 547-48 (Tex.Crim.App. 1996). 
Non-constitutional error that does not affect substantial
rights must be disregarded.  Tex. R. App. P. 44.2(b); Sells,
121 S.W.3d at 765, n.69.  Thus, we
will not reverse because of the erroneous admission of the statement if, after
examining the record as a whole, we have a fair assurance that it did not
influence the jury, or influenced them only slightly.  Gray v.
State, 233 S.W.3d 295, 299 (Tex.Crim.App. 2007), citing Ford v. State, 73 S.W.3d 923, 925
(Tex.Crim.App. 2002). 

            As
noted, in his recorded statement, appellant denied he assaulted Freda.  Instead, he said, they had an ongoing
relationship and she would often call him to come get her.  According to appellant, on the night in
question, Freda called him and he went to get her.  Later that night, she wanted to go to a “dope
house” but appellant refused to take her so she walked away from his house.  He asserted the neighbors were lying if they
said they saw him in the street fighting with Freda.  He also said Freda was lying if she said he
assaulted her.  

Appellant
contends the statement was devastating to his case because the jury was likely
to find incredible his recorded assertions that his neighbors were lying.[9]  As between him and Freda, he argues, his
recorded statement caused the jury to brand him as “the liar.”  He points to the harm analysis in Tigner, in which
the court concluded that without the defendant’s incriminating statement, the
State’s case was not “overwhelming.”  Tigner, 928 S.W.2d at 548.
The same is true here, appellant contends, because Freda’s testimony was
subject to such heavy impeachment. 

We
disagree.  In his advancement of his
argument, appellant forgets his beginning point:  the credible testimony of his neighbors.  Granted, in his statement appellant did not
merely say his neighbors were mistaken, he said they were lying, which may well
have damaged his credibility with the jury. 
But his neighbors’ testimony was always going to be damaging to the
theory appellant set out in his opening statement and supported with Curtis’s
testimony, that is, that Freda was at his house but left and was attacked by
someone else.  If the jury believed the
neighbors’ identification of him as the attacker, it was always going to reject
appellant’s theory, regardless of who testified to it.  

            The
State argues admission of appellant’s statement was harmless because it
supported his theory that Freda was attacked by someone else,[10]
and because appellant was able to use it as a substitute for testifying at
trial, avoiding cross-examination and impeachment.[11]  The State’s argument provides an additional
reason supporting our conclusion the error does not require reversal.  See Castaneda v. State, 852 S.W.2d 291, 294 (Tex.App.–San
Antonio 1993, no pet.) (finding error in admitting defendant’s
tape-recorded statement harmless because, if believed, statement would have
bolstered theories of self-defense and defense of third parties).

Having examined
the record as a whole, we find fair assurance the erroneous admission of
appellant’s statement did not influence the jury’s guilty verdict more than
slightly.  We overrule appellant’s second
point of error, and affirm the trial court’s judgment.

 

                                                                                                                                                                                                                                                            James
T. Campbell

                                                                                                            Justice

 

Do not publish.

 

            

 

 











[1] See Tex. Penal Code Ann. § 22.021 (Vernon 2007).

 





[2] Appellant’s conviction was
thus enhanceable pursuant to Penal Code § 12.42.  See
Tex. Penal Code Ann. § 12.42 (Vernon 2007). 
During the punishment phase of trial, appellant plead true to this
enhancement.  

 





[3] Jackson v. Virginia, 433 U.S. 307, 61
L.Ed.2d 560, 99 S.Ct. 2781 (1979).

 





[4] A record of his 911 call
was played for the jury. 

 





[5] Officer Sturgeon’s report
said “P. Escamilla could not identify R. Morrison by sight due to the dark
street.”  On cross-examination, Escamilla
testified she did not tell the officer she could not identify appellant by
sight that night because it was dark.  

 





[6] Appellant was later
arrested in a white pickup truck matching the description given by Freda and
appellant’s neighbors.  





[7] At trial, Freda
acknowledged she refused a rape examination at the hospital, telling the jury
she did not think it would help. 
However, as noted, she testified that she told both hospital personnel
and police that appellant “shoved his finger inside of [her].”

 





[8] Some testimony suggests the
officer was intending to refer to penile penetration when he talked to Freda.





[9] Appellant also points out
the jury asked to hear appellant’s statement again during their
deliberations.  





[10] Indeed, from the State’s fulsome description of the
benefits appellant derived from admission of his recorded statement, one might
wonder why the State offered it.

  





[11] During voir dire,
appellant’s counsel told the jury appellant would testify, but appellant decided
against taking the stand.  During his
closing, appellant’s counsel referred to the recorded statement, stating “Now,
I told you during voir dire that Ricky would come and
testify.  And then we decided, ‘why waste
your time?’  But you actually did hear
from Ricky.  Detective Taylor took his
statement.  He didn’t hide behind the 5th
Amendment. He told you he didn’t do it. 
He was surprised he got arrested.” 
The State also made brief reference to the content of the recorded
statement in closing argument.